**The PEOPLE of the State of Colorado,**
**Plaintiff–Appellee,**

v.

**Jason Benjamin REYNOLDS,**
**Defendant–Appellant.**

No. 08CA0397.

Colorado Court of Appeals,
Div. VI.

March 18, 2010.

Rehearing Denied May 20, 2010.

John W. Suthers, Attorney General, Majid Yazdi, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Dean Neuwirth, P.C., Dean Neuwirth, Denver, Colorado; Keyonyu X O'Connell, Denver, Colorado, for Defendant–Appellant.

Opinion by Judge CARPARELLI.

Defendant, Jason Benjamin Reynolds, appeals the judgment of conviction entered upon jury verdicts finding him guilty of two counts of extreme indifference first degree murder and two counts of vehicular homicide. He also appeals the sentence imposed. We affirm.

## I. Evidence

This is a road rage case in which defendant's actions caused the deaths of two other drivers. Among other things, defendant contends that one victim's conduct was retaliatory, was grossly negligent, and, thus, was an independent intervening cause.

A witness testified that, about 5 p.m. on November 8, 2005, he was driving a pickup traveling southbound on E–470 when he encountered barriers in the right lane at East Smoky Hill Road. The witness said that, after he moved into the left lane and slowed to about 65 miles per hour, a Jeep with big tires driven by a man in his thirties came up behind him, tailgated him, and reportedly came within a foot of the pickup's bed. According to the witness, after he passed the barriers, he gave a right turn signal and began moving into the right lane to allow the Jeep to pass. However, as he began changing lanes, the Jeep also moved into the right lane and he had to return to the left lane. The Jeep sped away at an estimated speed of 85 to 90 miles per hour, weaving in and out of traffic. The witness testified that he was so shaken that he exited the highway at Gartrell Road, which was sooner than he had planned.

Another witness testified that, shortly thereafter, he was driving southbound on E–470 and a Toyota 4Runner was ahead of him. He saw the Jeep approach and tailgate it and flash its lights to pass. After he had focused his attention elsewhere, he noticed the Jeep had moved in front of the 4Runner and then saw the 4Runner swerve to the left to avoid hitting the Jeep. According to the witness, the 4Runner corrected back to the right, but overcorrected and hit the side of the Jeep. After hitting the Jeep, the 4Runner swerved back to the left, crossed the median, and collided with a Ford Explorer in the northbound lane. The drivers of the 4Runner and the Explorer in the northbound lane both died as a result of the collision. A trooper who responded to the accident scene testified the same witness told him that defendant had "brake checked" the driver. However, at trial, the witness was unable to say whether he had seen the Jeep's brake lights come on.

The trooper testified that, at the scene, defendant told him he had changed lanes in front of the 4Runner when his work boot "accidentally hit his brake," and that "the 4Runner got up next to him and rammed his

vehicle." In a written statement, defendant said:

> As I pulled in front of this vehicle, I went to up shift my Jeep and I jammed half my boot onto the brake pedal. My Jeep slowed quickly and the vehicle behind me obviously had to slow. . . . [The driver] became angry and yanked his car into the [left] lane. He quickly accelerated and pulled up next to me. He was pointing at me or pointing something at me, yelling and all at the same time with no hesitation rammed my Jeep in a "side swipe" motion. Due to the large tires on my Jeep he instantly rebounded off the tires. At the same time he left the [right] lane and traveled onto the median, he went up the other side of the median and became airborne. At this time, I was on the edge of rolling my own vehicle because of the impact when he hit me. . . .

An investigator testified that he had also talked with defendant at the scene of the accident. He said defendant told him he had passed the 4Runner on the left and "swooped in front of him, and jammed [his] foot on the brake when [he] was shifting gears." The investigator testified that defendant said this "obviously angered the driver," and that "the driver . . . then pulled up alongside him on the left, made gestures . . . and then . . . intentionally swerved and rammed the side of his Jeep."

The witness who had seen the accident testified that he had also talked with defendant at the scene and that defendant said something to the effect of, "[T]hat guy waved something at me," or "[H]e hit me."

A tow truck driver who responded to the scene testified that defendant had told him, "[T] he guy got mad and tried to swerve around [me], and when he came up beside [me] he bumped into [my] Jeep and it shot him across the other side of the road . . . where the accident happened." The tow truck driver also testified that defendant said "that guy got what he deserved."

A prosecution expert testified that given the tire marks on the highway and the speed of travel, contrary to defendant's allegation, not enough time passed for the 4Runner

driver to have pulled alongside the Jeep and gestured to defendant.

Defendant did not testify. However, he presented two expert witnesses who testified, among other things, that the 4Runner driver made an unforced decision to move into the left lane, he lost control because the road curved, and the resulting yaw led to the impact with the Jeep. Neither expert believed the 4Runner driver had intentionally rammed the Jeep. The defense experts opined that the cause of the ultimate crash was not the Jeep braking in front of the 4Runner, but, rather, the 4Runner driver's independent loss of control after the 4Runner driver voluntarily moved to the left lane.

The prosecution also presented evidence that defendant drove his Jeep on E–470 between home and work each day and that, on separate occasions, two other drivers had reported defendant for driving dangerously on that highway. The first driver testified that shortly after 5 p.m. in July 2005, he was driving southbound on E470 when a truck registered to defendant came upon him at a high rate of speed, got very close to his rear bumper, and passed him on the right, and the truck's driver honked his horn, made an obscene gesture, and sped off. The second driver testified that, early one evening in September 2005, he was driving 70 or 75 miles per hour in the left southbound lane of E–470 while passing a vehicle in the right lane. A truck registered to defendant came upon him from behind, moved to the right, and came within inches of his vehicle; the truck's driver made an obscene gesture, forced him to move to the left toward the median, and squeezed the truck between his car and the vehicle he had been passing in the slow lane. The driver testified that, after passing him, the truck's driver drove into the left lane in front of him and slammed on his brakes, forcing him to put all his weight on his brakes to avoid hitting the truck. The driver testified that he "stood on [his] brakes" so hard that he "literally came off the seat." He testified further that he started to release his brake after the truck stopped braking, but that the truck's driver hit his brakes a second time, again forcing him to "stand" on his brakes. The incident

was so severe the driver called 911 and reported the incident and the truck's license number.

Based on these reports, in a letter dated less than six weeks before the events leading to this criminal case, the State Patrol notified defendant that his truck was reported to have engaged in dangerous acts including speeding, unsafe lane changes, and following too closely.

A jury found defendant guilty of two counts of extreme indifference first degree murder, two counts of vehicular homicide, and two counts of careless driving resulting in death. The court sentenced defendant to two consecutive mandatory life sentences on the extreme indifference murder counts, two consecutive twelve-year aggravated sentences on the vehicular homicide counts, and two consecutive one-year jail sentences on the careless driving resulting in death counts. The trial court ordered that the sentences for vehicular homicide and careless driving would run concurrent with the sentences for extreme indifference murder.

## II. Independent Intervening Cause Instruction

Defendant contends that his convictions for extreme indifference first degree murder and vehicular homicide must be reversed because the trial court declined to instruct the jury on the affirmative defense of independent intervening cause. We disagree.

Defendant asked for an intervening cause instruction during the jury instruction conference, arguing that the evidence included his out-of-court statements that the 4Runner driver intentionally rammed his Jeep. Defendant contends this was sufficient "credible evidence" to support an instruction. The trial court denied defendant's request, stating that, when the court viewed all of the evidence in the light most favorable to defendant, even if the 4Runner driver was grossly negligent, there was no break in the chain of causation that defendant started.

### A. Law

■ It is a trial court's duty to instruct the jury on all matters of law. *People v.*

*Munsey,* 232 P.3d 113, 118 (Colo.App. 2009). To be entitled to an affirmative defense instruction, a defendant must present "some credible evidence" on the issue addressed in the instruction. *People v. Garcia,* 113 P.3d 775, 783–84 (Colo.2005); *People v. Saavedra–Rodriguez,* 971 P.2d 223, 228 (Colo.1998). An independent intervening cause defense is treated as an affirmative defense for the purpose of determining the quantum of evidence necessary to submit the defense to the jury. *Saavedra–Rodriguez,* 971 P.2d at 228. Whether a defendant has met this burden is a question of law for the trial court. Consequently, we review the trial court's determination de novo. *Garcia,* 113 P.3d at 784.

Among other elements, the prosecution was required to prove that defendant's conduct caused the death of the two drivers. In this context, "cause" refers to an act that "in natural and probable sequence" produced the two deaths. *People v. Gentry,* 738 P.2d 1188, 1190 (Colo.1987); *see* CJI–Crim. 9(4) (1993). Thus, the prosecution was required to prove that defendant's conduct was a cause without which the deaths would not have occurred. *Id.*

■ A defendant's conduct is a cause of a victim's death in a criminal homicide if the conduct "began a chain of events the natural and probable consequence of which was the victim's death." *People v. Lopez,* 97 P.3d 277, 280 (Colo.App.2004) (quoting *Saavedra–Rodriguez,* 971 P.2d at 225).

■ However, a defendant will not be liable if the "act of an independent person or entity ... destroys the causal connection between the defendant's act and the victim's injury." *Saavedra–Rodriguez,* 971 P.2d at 225–26. To destroy the causal connection, the intervening cause must be conduct in which the defendant did not participate. *People v. Stewart,* 55 P.3d 107, 121 (Colo. 2002). Thus, when a later event contributes to the outcome, but would not have occurred but for the defendant's own conduct, the later event is not independent of the defendant's conduct and does not operate to relieve the defendant of liability. *See Gallimore v. Commonwealth,* 246 Va. 441, 436 S.E.2d 421, 427 (1993) (third party's shooting

of the victim was not an independent intervening cause because, but for the defendant's false story, the third party would not have killed the victim).

The other act must also be unforeseeable. *Stewart,* 55 P.3d at 121. In *Stewart,* the supreme court explained that it is foreseeable that the simple negligence of another may contribute to the death of a victim, and that, as a matter of law, such negligence is not an independent intervening cause. However, the court also explained that gross negligence is not foreseeable and, thus, *may* serve as an intervening cause. *Id.* There, a pedestrian was walking in a parking lot when the defendant veered his vehicle toward the pedestrian and brushed against him. An argument ensued, the defendant aggressively drove back and forth, and the pedestrian landed on the vehicle's motor hood. After the motion of the vehicle caused the victim to roll off the motor hood, the vehicle ran over and killed him. It was disputed whether the vehicle hit the pedestrian and threw him onto the motor hood or the pedestrian had intentionally jumped onto the motor hood.

The supreme court concluded that the facts did not implicate an intervening cause. The court held that even if the pedestrian's conduct was deemed grossly negligent, it would not have broken the causal chain that began with the defendant's conduct. *Id.* Consequently, the court held that the defendant could not be characterized as a nonparticipant and was not entitled to an instruction regarding independent intervening cause. *Id.*

### B. Analysis and Conclusions

■ Here, in his out-of-court statements, defendant admitted that he flashed his lights to pass the 4Runner, "swooped" in front of it after passing, and engaged his brakes either intentionally or unintentionally. Defendant's theory was that this conduct apparently so angered the 4Runner driver that he intentionally collided with defendant's Jeep. Even if the jury accepted defendant's descriptions of his own conduct and that of the 4Runner as true, and even if we assume the 4Runner driver's actions were grossly negligent and not foreseeable, the conduct of the 4Runner

driver would not have been an independent event and would not have broken the chain of events that began with defendant's admitted conduct and ended when the 4Runner and the northbound vehicle collided and the drivers of those vehicles died. Thus, there was no evidence upon which the jury could have concluded that defendant was not a participant in the final collision.

Accordingly, we conclude that the court did not err when it declined to give an instruction on independent intervening cause. Consequently, we need not address defendant's contention that the erroneous failure to give such an instruction was exacerbated by instructions about concurrent or contributory causes.

### III. Sufficiency of the Evidence

Defendant next contends that there was insufficient evidence for the jury to convict him of extreme indifference first degree murder for the deaths of the 4Runner driver and the driver of the other vehicle and vehicular homicide for the death of the driver of the other vehicle. We disagree.

### A. Standard of Review

When presented with a challenge based on the sufficiency of the evidence, we must determine whether that evidence, viewed as a whole and in the light most favorable to the prosecution, is sufficient to support a conclusion by a reasonable person that the defendant is guilty of the crimes charged beyond a reasonable doubt. *People v. Sherwood,* 5 P.3d 956, 959 (Colo.App.2000).

### B. Extreme Indifference First Degree Murder

In accordance with section 18–3–102, C.R.S.2009, murder in the first degree may be committed in five different ways. Extreme indifference first degree murder is one of them. A person commits extreme indifference first degree murder when

• the circumstances evidence an attitude of universal malice manifesting extreme indifference to the value of human life generally;

- the person knowingly engages in conduct that creates a grave risk of death to a person, or persons, other than himself; and
- the person thereby causes the death of another.

§ 18–3–102(1)(d), C.R.S.2009; *see* CJI–Crim. 9:04 (1983) (as amended); *see also People v. Baker*, 178 P.3d 1225, 1229 (Colo.App.2007).

■ Unlike intentional first degree murder after deliberation, the crime of extreme indifference first degree murder does not require proof that the defendant intended to cause the death of another. Instead, it requires proof that the defendant knowingly engaged in conduct that created a grave risk of death to one or more persons and demonstrated extreme indifference to the value of human life generally. § 18–3–102(1)(d); *Candelaria v. People*, 148 P.3d 178, 181 (Colo.2006).

In *Candelaria*, the defendant and his accomplices sought out a particular victim. Upon finding the victim's car, they fired as many as twenty-four rounds at the car, killing a passenger other than the intended victim. The supreme court noted that although the evidence showed that the defendant there intended to kill a particular person, there was also evidence that the defendant fired numerous shots at the intended victim's vehicle, aware that there were other people in the car with the intended victim. 148 P.3d at 180. There the court concluded that the evidence was sufficient to prove *both* intentional first degree murder *and* extreme indifference first degree murder of the same victim and that findings to that effect were not inconsistent.[1]

### C. Driver of the 4Runner

Defendant first contends that the evidence was insufficient to support a conviction of extreme indifference murder of the 4Runner driver. He premises his argument on the supreme court's statement in *People v. Jefferson*, 748 P.2d 1223, 1233 (Colo.1988) that, "extreme indifference murder is committed only if the killing conduct is of a type which is not directed against a particular person at all." Defendant also relies on reference to that statement by a division of this court in *People v. Perez*, 972 P.2d 1072, 1074 (Colo. App.1998).

In *Candelaria*, the supreme court reversed the decision of a division of this court that applied the language in *Jefferson* upon which defendant now relies. Based on that language, and on the application of that language in *People v. Perez*, the division concluded that convictions of intentional murder after deliberation and extreme indifference murder were inconsistent. *People v. Candelaria*, 107 P.3d 1080, 1088 (Colo.App.2004). However, the supreme court reversed, concluding that the convictions were not inconsistent. The court explained that it did not intend the statement in *Jefferson* to suggest "that one could not intentionally kill a particular individual in a manner demonstrating a willingness to take human life indiscriminately, or that doing so would not fall within" section 18–3–102(1)(d). *Candelaria*, 148 P.3d at 182. Thus, the court held that the prosecution had proved first degree murder of the victim under *both* theories. *Id.* at 183. The court explained that, although the defendant could be convicted of only one murder, the evidence showed that he had intentionally killed the victim and had done so in a manner that *also* created a grave risk of death to one or more persons and demonstrated extreme indifference to the value of human life. *Id.*

The court further explained that the addition of the words "or persons" in the 1981 amendment of section 18–3–102(1)(d) "necessarily comprehends killing acts that put at grave risk a number of individuals not targeted by the defendant, *as well as acts putting at risk a single victim*, without knowing or caring who that may be." *Id.* at 182–83 (emphasis added); *see also* ch. 212, sec. 4, § 18–3–102(1)(d), 1981 Colo. Sess. Laws 972, 973.

Indeed, the court stated that even when a person acts with the conscious objective of killing a particular person, "he may do so in a manner that to a rational mind [also] demonstrates an extreme indifference to the value of human life generally or . . . in a manner that to a rational mind merely demonstrates

---

1. The court concluded that although the prosecution had proved first degree murder under both *theories*, it had, nonetheless, proved only one murder and the mittimus had to be corrected to reflect a single verdict of guilt for first degree murder. *Candelaria*, 148 P.3d at 183.

a willingness to take the life of that particular individual." *Candelaria*, 148 P.3d at 182. Thus, even when the evidence shows that a defendant intended the death of a particular person, he may be found guilty of extreme indifference murder of that person if the jury finds that the manner in which the defendant acted demonstrated extreme indifference to human life generally.[2] *Id.*

Here, viewed as a whole and in the light most favorable to the prosecution, the evidence abundantly supported a conclusion by a reasonable person that defendant's conduct created a grave risk of death to the 4Runner driver as well as the drivers of all nearby vehicles and that his conduct demonstrated extreme indifference to the value of human life generally.

### D. Driver of the Northbound Explorer

■ We also reject defendant's contention that there was insufficient evidence to prove extreme indifference murder and vehicular homicide of the driver of the Explorer. Defendant's premise is that he cannot be found guilty of consequences that were not foreseeable and that the evidence was not sufficient to prove that the death of the Explorer driver was foreseeable.

To prove extreme indifference murder of the Explorer driver, the prosecution was required to prove, among other things, that defendant's conduct caused his death. To prove vehicular homicide of that driver, the prosecution was required to prove that defendant's reckless driving was the proximate cause of the driver's death.

Here, viewing the evidence as a whole and in the light most favorable to the prosecution, we conclude there was abundant evidence to support a conclusion by a reasonable person that defendant drove his Jeep in a manner that, in natural and probable sequence, resulted in the death of the Explorer driver, and that his conduct was a cause without which the driver's death would not have occurred.

We reject defendant's argument that just as a negligent person is civilly liable only if injury to the particular plaintiff was foreseeable, he is not criminally liable because the death of the Explorer driver was not foreseeable. Contrary to defendant's assertion, the *Lopez* division held neither that Colorado's civil causation instructions apply in Colorado criminal cases, nor that the foreseeability limitation that applies to civil liability for negligence also applies to criminal liability for homicide. We also reject defendant's suggestion that we should adopt such a rule here.

And, indeed, even if such a rule existed, the evidence here was sufficient to permit a reasonable juror to conclude beyond a reasonable doubt that it was foreseeable that defendant's conduct would injure or kill a nearby driver or pedestrian.

### IV. Aggravated Sentence

Defendant contends that if his extreme indifference murder conviction for the 4Runner driver is dismissed pursuant to this appeal, then there would be no basis for the aggravated sentence for the vehicular homicide conviction. Because we have affirmed defendant's extreme indifference murder conviction for the driver, the aggravated sentence is valid.

### V. Cumulative Error

Defendant contends that his due process rights under the federal and state constitutions were violated because the errors argued in this appeal constitute cumulative reversible error.

Because we have found no error, we necessarily reject defendant's final contention of cumulative error. *See People v. Laurson*, 15 P.3d 791, 798 (Colo.App.2000).

The judgment and sentence are affirmed.

Judge LOEB and Judge BERNARD concur.

---

**2.** As further explanation, the court provided the following example. Although the act of hiding an explosive device on an airplane with the intent to kill one of the passengers is a murderous act directed at a particular person, it also gravely endangers other passengers as well, and, consequently, evidences an extreme indifference to the value of human life generally. 148 P.3d at 182.