Colorado Court of Appeals Opinions || April 7, 2016

Colorado Court of Appeals -- April 7, 2016
2016 COA 47. No. 12CA0889. People v. Anderson.

  

 
 
 
 COLORADO COURT OF APPEALS

 
 2016 COA 47

 
 

  

 Court of Appeals No. 12CA0889
 Douglas County District Court No. 10CR454
 Honorable Paul A. King, Judge

 The People of the State of Colorado,

 Plaintiff-Appellee,

 v.

 Richard Wesley Anderson,

 Defendant-Appellant.

 JUDGMENT AND SENTENCE AFFIRMED IN PART
 AND VACATED IN PART AND CASE REMANDED WITH DIRECTIONS

 Division V
 Opinion by JUDGE ROTHENBERG*
 Furman, J., concurs
 Bernard, J., specially concurs

 Announced April 7, 2016

 Cynthia H. Coffman, Attorney General, Elizabeth Rohrbough, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

 Douglas K. Wilson, Colorado State Public Defender, Elizabeth Porter-Merrill, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

 *Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2015.

  

  

 ¶1        Defendant, Richard Wesley Anderson, appeals his judgment of conviction and sentences for attempted extreme indifference first degree murder; first degree assault, threatening a peace officer with a weapon; first degree assault, serious bodily injury with a deadly weapon; and first degree assault, extreme indifference. We vacate his conviction for attempted extreme indifference murder. We further conclude that his convictions and separate sentences on three different theories of first degree assault violate double jeopardy. On remand the trial court is instructed to vacate his conviction for attempted extreme indifference first degree murder and two of his convictions and sentences for first degree assault, and to correct the mittimus accordingly.

 I. Background

 ¶2        Anderson became so depressed after his wife’s death and the loss of his job and home that he decided to commit suicide. After a night of heavy drinking at a bar, he went to his car, which was parked in the bar’s parking lot. Anderson pulled a gun on another patron, who had come outside to check on his well-being, and then shouted obscenities at the bar’s manager, who also had come outside. Anderson then drove away.

 ¶3        The bar’s manager called 911 to report the incident. A police officer was nearby and responded by pulling over Anderson’s car. Anderson then got out of his car and fired multiple bullets at the officer’s patrol car. One bullet hit the officer’s arm, wounding him. As Anderson attempted to reload his gun, the officer shot Anderson twice, ending the incident. The evidence at trial established that Anderson and the officer were the only persons on the road. The officer was on patrol alone, it was about 2 a.m., and there were no other cars or traffic in the area.

 ¶4        At trial, Anderson admitted to shooting at the officer but maintained that he did not intend to harm the officer. According to Anderson, he wanted to force the officer to shoot him as a means of committing suicide. He thus maintained that he lacked the requisite mens rea for attempted extreme indifference murder.

 ¶5        During their deliberations, the jurors sent out five separate notes to the court requesting additional guidance on the mental state required to convict a defendant of attempted extreme indifference first degree murder. These notes clearly indicated that the jurors were having a very difficult time trying to harmonize the mental elements of the attempt offense and the substantive charge. The problem arose because the jury was instructed on the elements of attempted extreme indifference first degree murder as follows:

 1. That the defendant,

 2. In the state of Colorado, at or about the date and place charged,

 3. with intent to commit the crime of Murder in the First Degree, Engaged in conduct constituting a substantial step toward the commission of murder in the First Degree.

 (Emphasis added.)

 ¶6        The jury was also instructed that extreme indifference first degree murder required that the defendant "knowingly engaged in conduct which creates a grave risk of death to a person or persons other than himself." (Emphasis added.)

 ¶7        Thus, the attempt instruction included the mens rea of "with intent," and the extreme indifference murder instruction included the mens rea of "knowingly."

 ¶8        The court sent the jurors five written responses before they returned the above-mentioned verdicts. Following the verdicts, the trial court sentenced Anderson to 48 years in the custody of the Department of Corrections for the attempted extreme indifference murder conviction, and to a concurrent sentence of 30 years on the first degree assault (extreme indifference) conviction. It also imposed consecutive sentences of 30 years on the two remaining first degree assault convictions, for a total of 108 years.

 ¶9        Anderson contends that (1) the evidence was insufficient to convict him of attempted extreme indifference murder; (2) the jury instructions on both extreme indifference murder and attempted extreme indifference murder provided incorrect mens rea instructions; (3) his convictions for first degree assault violate double jeopardy; and (4) his sentences are based upon identical evidence and must run concurrently.

 II. Sufficiency of the Evidence

 ¶10        Anderson first contends there was insufficient evidence to convict him of attempted extreme indifference murder. He alleges that the evidence was insufficient because the prosecution did not present evidence that he acted with "universal malice," both because (1) he did not intend to kill anyone other than himself and (2) his conduct only endangered one person. We disagree with his first contention but agree with his second.

 A. Standard of Review

 ¶11        We review a sufficiency of the evidence claim de novo. People v. Davis, 2012 COA 56, ¶11.

 ¶12        To determine whether there was sufficient evidence to support a conviction, we ask "whether the relevant evidence, both direct and circumstantial, when viewed as a whole and in the light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable mind that the defendant is guilty of the charge beyond a reasonable doubt." Clark v. People, 232 P.3d 1287, 1291 (Colo. 2010) (citation omitted). We give the prosecution the benefit of every reasonable inference which may be fairly drawn from the evidence. Id. at 1292.

 ¶13        "We will not set aside a conviction for lack of evidence because a conclusion different from that reached by the jury might be reached on the same evidence." People v. Fuller, 791 P.2d 702, 706 (Colo. 1990).

 B. Attempted Extreme Indifference Murder

 ¶14        Colorado is the only state in the union that explicitly recognizes this particular attempt crime, and "the concept of attempting to commit a homicide through extreme indifference or recklessness [has been] ‘largely disfavored by legal scholars and almost . . . universally rejected in American law.’" People v. Rubio, 222 P.3d 355, 358 (Colo. App. 2009) (citation omitted). Nonetheless, we must apply the law that the legislature enacted and that our supreme court has definitively construed "absent some constitutional impediment." Id.

 ¶15        A person commits extreme indifference first degree murder if "[u]nder circumstances evidencing an attitude of universal malice manifesting extreme indifference to the value of human life generally, he knowingly engages in conduct which creates a grave risk of death to a person, or persons, other than himself, and thereby causes the death of another." § 18-3-102(1)(d), C.R.S. 2015.

 ¶16        "A person commits criminal attempt if, acting with the kind of culpability otherwise required for commission of an offense, he engages in conduct constituting a substantial step toward the commission of the offense." § 18-2-101(1), C.R.S. 2015.

 ¶17        Attempted extreme indifference murder "covers knowing conduct that created a grave risk of, but did not result in, death." Rubio, 222 P.3d at 359.

 C. Discussion

 ¶18        We disagree with Anderson’s first contention that his subjective intent precludes a conviction for attempted extreme indifference murder. Unlike intentional first degree murder after deliberation, the crime of extreme indifference murder "does not require proof that the defendant intended to cause the death of another . . . [but] proof that the defendant knowingly engaged in conduct that created a grave risk of death to one or more persons and demonstrated extreme indifference to the value of human life generally." People v. Reynolds, 252 P.3d 1128, 1133 (Colo. App. 2010).

 ¶19        Thus, even if defendant meant only to effect his own suicide by provoking the officer to shoot him, Anderson’s knowing and voluntary acts of firing numerous gunshots at the officer permit his conviction for attempted extreme indifference murder. His desire to commit "suicide by cop" is no excuse. See Rubio, 222 P.3d at 359 (Defendant’s conduct "in fact created a grave risk of death [because e]ven if he meant only to destroy a car, spraying such firepower around a neighborhood could be found to reflect an attitude of universal malice manifesting extreme indifference to human life generally."). Therefore, on this basis only, his conviction is not precluded.

 ¶20        However, we agree with Anderson’s related second contention that there was insufficient evidence that he sought to take human life generally because he fired shots at a single person, namely, the officer, and no other person was around or endangered by his conduct. Anderson maintains — and we agree — that his conduct was not the type proscribed by the statute’s universal malice requirement.

 ¶21        The dispositive issue is whether more than one person must be placed at risk by the defendant’s conduct in order for the circumstances to evidence an attitude of universal malice manifesting extreme indifference to human life generally. We conclude that where, as here, the defendant’s conduct does not endanger more than one person, the evidence is insufficient to sustain a conviction for attempted extreme indifference first degree murder.

 ¶22        In 1981, the Colorado legislature amended section 18-3-102 to include the phrase "evidencing an attitude of universal malice" and to refer to human life "generally." People v. Jefferson, 748 P.2d 1223, 1230 (Colo. 1988) (emphasis omitted) (quoting Ch. 212, sec. 4, § 18-3-102, 1981 Colo. Sess. Laws 973). The statute construed in Jefferson contains the same language as the current statute. Id.

 ¶23        In Jefferson, the court concluded:

 [T]he 1981 addition of the words "universal malice" and "generally" to the language of the statute is an unmistakable indication of the legislative intent to . . . limit the application of extreme indifference murder to situations in which the actor demonstrates an indifference to human life generally, as distinguished from indifference to, or willingness to take, a particular human life.

 . . . .

 . . . [T]he legislature has attempted to proscribe a kind of knowing, killing conduct which it considers to be of greater social consequence and which merits greater punishment. The extreme indifference murder charge is more blameworthy than the second-degree murder charge, because the defendant’s conduct demonstrates that his lack of care and concern for the value of human life generally are extreme, and that the circumstances of his actions evidence that aggravated recklessness or cold-bloodedness which has come to be known as "universal malice."

 Id. at 1232. Jefferson thus implied that "extreme indifference murder is committed only if the killing conduct is of a type which is not directed against a particular person at all." Id. at 1233.

 ¶24        Following Jefferson, several divisions of the Colorado Court of Appeals concluded that a defendant’s actions must put more than one person’s life in danger in order to support a conviction for extreme indifference murder. See, e.g., People v. Ellis, 30 P.3d 774, 778 (Colo. App. 2001); People v. Perez, 972 P.2d 1072, 1074 (Colo. App. 1998); People v. Zekany, 833 P.2d 774, 776 (Colo. App. 1991).

 ¶25        In Candelaria v. People, 148 P.3d 178 (Colo. 2006), the defendant was charged with first degree murder and several lesser offenses arising from a gang-related shooting. On the night of the offense, the defendant drove a car with several armed individuals in search of P.M., to retaliate for a shooting incident involving P.M. that had occurred earlier that evening. Id. at 180.

 ¶26        The defendant and his companions encountered four individuals in P.M.’s car and fired as many as twenty-four rounds at it, killing G.R., a teenage passenger. Id. The prosecution charged the defendant with, among other things, extreme indifference murder and the deliberate murder of G.R., and the attempted murder of P.M. under both the deliberation and extreme indifference subsections of the first degree murder statute. The jury found the defendant guilty of the first degree murder of G.R. and of the attempted first degree murder of P.M., under both the deliberation and extreme indifference subsections of the first degree murder statute. Id.

 ¶27        A division of the court of appeals held that murder after deliberation is committed only if the perpetrator’s malice is directed toward a single, identifiable individual, whereas extreme indifference murder requires proof of malice that is not directed against a single individual. Id.

 ¶28        However, the Colorado Supreme Court disagreed, reasoning as follows:

 the evidence in this case was sufficient to support findings of [guilt for both murder after deliberation and extreme indifference murder]. While there was an abundance of evidence that the defendant and those in his car were specifically searching for P.M. to kill him, there was also evidence that they fired numerous shots in the direction of [P.M.’s] vehicle, aware that other people whom they did not know or have grievances against were present in or around the vehicle. Although the boy they killed was not P.M., the jury was instructed as to deliberate murder according to a theory of transferred intent. At the same time, however, the evidence was sufficient to permit a finding that they were aware their shooting was practically certain to cause death and was carried out under circumstances evidencing a willingness to take the lives of others without knowing or caring who they were.

 Id. at 183 (emphasis added) (footnotes omitted).

 ¶29        Candelaria makes perfect sense because the defendant there intended to kill a particular person, P.M., but was unsuccessful and therefore could only be charged with an attempt. However, the defendant also acted with extreme indifference by firing numerous gunshots into a car with four passengers. This act clearly manifested "a cold-blooded disregard for the value of human life generally." Id. at 182.

 ¶30        As the supreme court explained, "when we distinguished the killing conduct necessary for extreme indifference murder as a type not directed against a particular person, we therefore did not mean to suggest that one could not intentionally kill a particular individual in a manner demonstrating a willingness to take human life indiscriminately." Id. (citation omitted).

 ¶31        The court in Candelaria recognized that a defendant may intend to kill a particular person, but that his or her conduct may endanger more people than just that particular intended victim. Id.; see also Reynolds, 252 P.3d at 1133. For example, the court observed that placing a bomb on an airplane, with the express intent to harm a particular victim, would constitute extreme indifference murder because while it "is certainly a murderous act directed at a particular, intended victim, it is not directed solely at the intended victim. Because it is an act gravely endangering the other passengers as well, it constitutes conduct evidencing an extreme indifference to the value of human life generally." Candelaria, 148 P.3d at 182.

 ¶32        A division of this court similarly concluded that a defendant, whose road rage directed at another car caused its driver’s death, could be convicted of extreme indifference murder. Reynolds, 252 P.3d at 1133-34. There, while the defendant’s conduct was directed toward a particular car and driver, the evidence was sufficient because the defendant’s conduct created a grave risk of death to "the drivers of all nearby vehicles." Id. at 1134.

 ¶33        Anderson’s case is clearly distinguishable because no one was nearby when he fired the shots. It is undisputed that Anderson shot the gun toward the officer immediately after getting out of his car, and that the only persons at the scene were Anderson and the officer.

 ¶34        Nor are we persuaded otherwise by the statutory language specifying risk of death to "a person." Section 18-3-102(1)(d) specifies that a person must "knowingly engage[] in conduct which creates a grave risk of death to a person, or persons, other than himself." (Emphasis added.) The inclusion of "a person" does not expand the crime of extreme indifference first degree murder to situations in which only a single person is put at risk.

 ¶35        The language clarifies that a single victim may be the intended target of an attack that puts more than one person at risk, as was the situation in Candelaria. Reading the statute as a whole, the required universal malice toward "human life generally" indicates that the conduct must place more than one life at risk, regardless of whether the intended victim is a particular person or persons. Both Jefferson and Candelaria support this conclusion.

 ¶36        In Jefferson, the supreme court concluded that the 1981 amendments to the statute evidenced a legislative intent to

 limit the application of extreme indifference murder to situations in which the actor demonstrates an indifference to human life generally, as distinguished from indifference to, or willingness to take, a particular human life. This interpretation is supported by the addition of the words ‘or persons’ following person in the statute.

 748 P.2d at 1232. Thus, in Jefferson, the supreme court read the words "person or persons" to indicate the particular persons targeted by, not simply placed at risk from, the defendant’s conduct.

 ¶37        Although Candelaria clarified that a defendant may be convicted of extreme indifference murder if he intended to kill a particular victim, his conduct nonetheless must still endanger more than one person. There, the supreme court concluded that "person" may refer to a particular intended victim without removing the requirement that there be other people placed at risk by the defendant’s conduct. The court reasoned that the legislature’s addition of the words "or persons," instead of "substituting them for the existing ‘person,’ . . . [indicated that] the amended statute[] necessarily comprehends killing acts that put at grave risk a number of individuals not targeted by the defendant, as well as acts putting at risk a single victim, without knowing or caring who that may be." Candelaria, 148 P.3d at 182-83. Although this could be read to include acts putting at risk only "a single victim," the court then cited two Washington state cases, both of which interpret similarly worded statutory provisions to conclude that a defendant’s conduct must place at risk more than one individual. Id. at 183; see State v. Anderson, 616 P.2d 612, 615-17 (Wash. 1980) (excluding from this class of murder only acts "aimed at or intended and inflicted upon a specific individual and no other" and rejecting State’s argument that the "extreme indifference to human life" element may be "directed toward one individual: the murdered person"); State v. Pettus, 951 P.2d 284, 287 (Wash. Ct. App. 1998) (acknowledging that conduct jeopardizing only the life of the victim cannot support a conviction requiring extreme indifference to human life in general), abrogated on other grounds by State v. Henderson, 321 P.3d 298 (Wash. Ct. App. 2014).

 ¶38        Therefore, we are persuaded that the words "a person or persons" indicate that the defendant may target a particular person or persons. The statute still requires that the defendant exhibit an attitude of universal malice manifesting an extreme indifference to the value of human life generally, which requires more than one person to be placed at risk by the defendant’s conduct.

 ¶39        In summary, we conclude Anderson’s conduct in this case was insufficient as a matter of law to establish universal malice manifesting an extreme indifference to human life generally because his conduct placed only one person, the officer, at risk. Hence, his conviction of attempted extreme indifference murder must be vacated.

 ¶40        Given our conclusion, we do not reach Anderson’s contention that the evidence was insufficient because there was no evidence that the officer’s injuries created a "grave and serious" risk of death. We also need not address his contention that the extreme indifference murder jury instruction did not inform the jury that "knowingly" applied to the conduct, circumstances, and result elements of the crime, unconstitutionally lowering the prosecution’s burden of proof. Similarly, we need not address his challenge to the attempted extreme indifference murder jury instruction.

 III. Double Jeopardy Violations

 ¶41        Anderson next contends he should receive a single first degree assault conviction and sentence because his three sentences violate double jeopardy. He maintains that they are three ways of committing the same offense: first degree assault. We agree.

 ¶42        Anderson was convicted of first degree assault (causing serious bodily injury), in violation of section 18-3-202(1)(a), C.R.S. 2015; first degree assault (extreme indifference), in violation of section 18-3-202(1)(b); and first degree assault on a peace officer, in violation of section 18-3-202(1)(e). He was sentenced to thirty years in the custody of the Department of Corrections on each count. His sentences for assault on a peace officer and assault (serious bodily injury) were entered to run consecutively to each other and to his sentence for attempted first degree murder, while the sentence for assault (extreme indifference) was entered to run concurrently.

 A. Preservation and Standard of Review

 ¶43        "We review de novo a claim that a conviction violates a defendant’s constitutional protection against double jeopardy." People v. Arzabala, 2012 COA 99, ¶19.

 ¶44        Anderson preserved his claim that first degree assault (serious bodily injury) and first degree assault (extreme indifference) should merge by raising that with the trial court.

 ¶45        However, the People argue, and we agree, that Anderson did not raise this argument with regard to the third assault conviction, first degree assault on a peace officer.

 ¶46        At the sentencing hearing, defense counsel cited People v. Baird, 66 P.3d 183 (Colo. App. 2002), and People v. Tallwhiteman, 124 P.3d 827 (Colo. App. 2005), to argue that

 a conviction for both first-degree assault and first-degree assault extreme indifference cannot be upheld if there is only one victim in one criminal act. . . . [F]irst-degree assault with intent to cause serious bodily injury and first-degree assault extreme indifference are alternative means of committing the same offense. Therefore, one of the first-degree assault convictions must be vacated.

 [T]hose first-degree assault convictions must merge at sentencing and therefore run concurrent.

 ¶47        Defense counsel thus argued that first degree assault (serious bodily injury) and first degree assault (extreme indifference) must merge, but did not make a similar argument regarding the first degree assault (peace officer) conviction. Because Anderson did not raise in the trial court the specific claim that his conviction for first degree assault on a peace officer was a double jeopardy violation, we review this claim only for plain error. People v. Tillery, 231 P.3d 36, 47 (Colo. App. 2009), aff’d sub nom. People v. Simon, 266 P.3d 1099 (Colo. 2011) (discussing split in court of appeals cases regarding reviewability of unpreserved double jeopardy claims); see People v. Friend, 2014 COA 123M, ¶49 (reviewing unpreserved double jeopardy claim for plain error) (cert. granted Feb. 8, 2016); see also People v. Barry, 2015 COA 4, ¶105 (same).

 ¶48        Nevertheless, the underlying concern of plain error "can be restated as . . . a reasonable possibility that the error contributed to the sentence." Tillery, 231 P.3d at 48. In the double jeopardy context, "the answer would invariably be ‘yes.’" Id.; see also Barry, ¶106 ("If we conclude that a double jeopardy violation occurred, it will likely constitute plain error."); Arzabala, ¶19 ("Where a reviewing court finds a double jeopardy violation, regardless of whether the issue was raised in the trial court, the defendant is entitled to appropriate relief on appeal.").

 B. Law

 ¶49        "The Double Jeopardy Clauses of the United States and Colorado Constitutions protect an accused against being twice placed in jeopardy for the same crime." Woellhaf v. People, 105 P.3d 209, 214 (Colo. 2005). It protects "not only against a second trial for the same offense, but also ‘against multiple punishments for the same offense.’" Arzabala, ¶20 (citation omitted).

 ¶50        Multiplicity is the charging of multiple counts and the imposition of multiple punishments for the same criminal conduct. Barry, ¶94. Multiplicity may arise where "a defendant is charged with and convicted of multiple counts under a single criminal statute, and the statute does not create more than one offense but, rather, provides for alternative ways of committing the same offense." Id. at ¶95; see also Woellhaf, 105 P.3d at 215 (Multiplicity may arise when statutes provide for "alternate ways of committing the same offense."). Although the prosecution may charge in separate counts of the complaint alternative ways of committing a single offense, unless expressly authorized by the legislature, the double jeopardy violation "occurs when a trial court imposes multiple convictions for the same offense because the defendant committed the crime using more than one of the prohibited alternative means." Barry, ¶89.

 ¶51        We must first determine the unit of prosecution prescribed by the statute, and then we determine whether the prosecution alleged factually distinct offenses to justify more than one unit of prosecution. Woellhaf, 105 P.3d at 215; Friend, ¶52.

 ¶52        The first "inquiry is whether the legislature intended to create more than one offense." Barry, ¶95; see People v. Abiodun, 111 P.3d 462, 465 (Colo. 2005). If the statute merely describes multiple ways of committing the same offense, a defendant cannot be convicted of more than one violation of the statute unless the defendant’s conduct constitutes factually distinct offenses. Barry, ¶97; see also Friend, ¶54.

 ¶53        Where the legislature has proscribed conduct "in different provisions of the penal code and identifies each provision with a different title, its intent to establish more than one offense is generally clear." Abiodun, 111 P.3d at 465; see also Barry, ¶96. But where the legislature has joined "alternatives disjunctively in a single provision of the criminal code, the legislature intended to describe alternate ways of committing a single crime rather than to create separate offenses." Abiodun, 111 P.3d at 467; see also Barry, ¶96 (same); Friend, ¶53 ("[T]he General Assembly prescribes a single unit of prosecution when it joins alternative ways of committing a crime with a disjunctive ‘or’ in a single provision of a statute.").

 ¶54        Section 18-3-202 proscribes "assault in the first degree." Subsection 202(1)(a) states that "[a] person commits the crime of assault in the first degree if . . . [w]ith intent to cause serious bodily injury to another person, he causes serious bodily injury to any person by means of a deadly weapon."

 ¶55        Subsection 202(1)(c) states that "[a] person commits the crime of assault in the first degree if . . . [u]nder circumstances manifesting extreme indifference to the value of human life, he knowingly engages in conduct which creates a grave risk of death to another person, and thereby causes serious bodily injury to any person."

 ¶56        Subsection 202(1)(e) states that $$[a] person commits the crime of assault in the first degree if . . . [w]ith intent to cause serious bodily injury upon the person of a peace officer . . . he or she threatens with a deadly weapon a peace officer . . . engaged in the performance of his or her duties, and the offender knows or reasonably should know that the victim is a peace officer . . . acting in the performance of his or her duties.

 ¶57        Each subsection is joined by the disjunctive conjunction of "or."

 ¶58        Subsections 202(1)(a) and 202(1)(c) are alternative means of committing the same offense. Tallwhiteman, 124 P.3d at 834; Baird, 66 P.3d at 193.

 ¶59        We have not found, and neither party cites, any cases that have determined whether subsection 202(1)(e), first degree assault on a peace officer, proscribes a different offense. We acknowledge that subsection 202(1)(e) does not require that the defendant cause injury, as required by subsections 202(1)(a) and 202(1)(c), but only requires that the defendant threaten a peace officer. See § 18-3-202(1)(e); see also People v. Delgado-Elizarras, 131 P.3d 1110, 1113 (Colo. App. 2005) (distinguishing the crimes of reckless endangerment and first degree assault on a peace officer because the latter requires proof that defendant threatened the peace officer).

 ¶60        "Simply because the alternative ways for committing a single offense require proof of different acts and even different culpable mental states does not mean that a single offense has not been defined by the statute . . . ." People v. Viduya, 703 P.2d 1281, 1292 (Colo. 1985).

 ¶61       Here, the legislature included subsections 202(1)(a), 202(1)(c), and 202(1)(e) in the same provision of the criminal code, rather than separating out first degree assault on a peace officer as a separate offense defined by a different section of the code. See Abiodun, 111 P.3d at 466. The subsections are divided by "or," indicating that they are disjunctive, alternative ways that a defendant may be guilty of first degree assault. See Friend, ¶53; see also Viduya, 703 P.2d at 1292 (concluding that vehicular homicide is one offense, with one punishment, that can be committed in one of two ways — causing the death of another while operating a motor vehicle in a reckless manner, or while under the influence of any drug or intoxicant).

 ¶62        We conclude that the structure of the statute, under one heading proscribing "first degree assault," as well as the disjunctive "or" to demarcate the different subsections, indicates that the statute establishes a single offense of first degree assault with alternative means of commission.

 C. Discussion

 ¶63        Anderson contends that his assault convictions are alternative ways of committing first degree assault, and that where there is one victim and one act, he may only be convicted and sentenced for first degree assault under section 18-3-202(1) once. We agree.

 ¶64        The People concede, and we agree, that Anderson’s convictions for first degree assault (serious bodily injury) and first degree assault (extreme indifference) should merge. See Baird, 66 P.3d at 193. Accordingly, we adopt the People’s request to vacate his conviction and sentence on first degree assault (extreme indifference), and we remand to the trial court to do so.

 ¶65        Because we have concluded that section 18-3-202 proscribes only one crime, first degree assault, with alternative means of committing it, we next consider whether Anderson may be convicted of multiple first degree assaults because the prosecution presented his actions as factually distinct offenses. Friend, ¶54.

 ¶66        The People argue that Anderson’s conviction of first degree assault on a peace officer "is based on a separate assaultive act, his threatening the officer with a deadly weapon, and that act was completed before he fired the shot that caused serious bodily injury to the officer." We disagree.

 ¶67        The record does not support the People’s argument that the prosecution relied on the lifting or pointing of the gun, before any shots were fired, as the threatening conduct to support the conviction of first degree assault on a peace officer separately from other facts that supported the other convictions. Indeed, during the jury instruction conference, defense counsel, the prosecutor, and the trial court had this exchange:

 [Defense Counsel]: . . . [W]hat it appears to us based on the prosecution’s argument and the way that they’ve charged this is that this is all one act. The 13 shots is one act.

 . . . .

 If they’re going off the theory that the attempted murder was one act and the assault was a different act, then I think we need some kind of unanimity instruction here that will ensure that the jurors reach a unanimous verdict . . . .

 . . . .

 [Prosecutor]: Judge, I decidedly remember losing the argument that raising a weapon is a different act than firing the weapon. To us, it is all one act that we’ll be arguing charged multiple different ways.

 [The Court]: What he’s saying, . . . there’s one act, one event. During that one event, you can make an argument that from start to finish, raising the weapon to pointing it to firing it is all part of an event.

  . . .

 [Prosecutor]: . . . We’re not going to say that Bullet No. 1 was felony menacing and raising the gun was something else and whatever. Really all of the facts can support any of the charges, and how the jury parses them is how they parse them, but we’re arguing that all of the facts support all of the charges.

 [The Court]: So what I’m hearing then . . . is that the event itself is the basis for all the charges that are filed. . . .

 [Defense Counsel]: . . . I was more concerned about the district attorneys arguing that the raising of the gun might have been the attempted murder or the assault on a peace officer and the bullets being fired were the first-degree assault, but if the prosecution is pursuing a theory that it’s all one act, we don’t need a unanimity instruction.

 (Emphasis added.)

 ¶68        Here, the prosecutor disclaimed the idea that different acts — for example, raising the gun or shooting some of the bullets — supported different charges. The prosecutor conceded that all of Anderson’s actions — getting out of the car, facing the officer, raising the gun, and shooting — constituted one continuous course of conduct that factually supported all the charges.

 ¶69        We therefore remand the case with directions to vacate Anderson’s conviction and sentence for first degree assault (extreme indifference) and either his conviction and sentence for first degree assault on a peace officer or first degree assault (serious bodily injury). Because Anderson received the same consecutive 30 year sentence for first degree assault on a peace officer and first degree assault (serious bodily injury), regardless of which conviction is vacated, his remaining term of imprisonment would be the same, at 30 years. On remand, the trial court is instructed to vacate his conviction and sentence for one, and the other will remain unaffected.

 IV. Concurrent Sentencing

 ¶70        Finally, Anderson argues that his sentences for attempted extreme indifference murder and first degree assault must run concurrently, not consecutively, because they were based on identical evidence. Because we vacate his conviction for attempted extreme indifference murder on the basis of insufficient evidence, we need not address this contention.

 V. Conclusion

 ¶71        Anderson’s convictions and sentences for attempted extreme indifference murder, first degree assault (extreme indifference), and one of either first degree assault (peace officer) or first degree assault (serious bodily injury) are vacated. His remaining conviction and sentence for first degree assault remains unaffected. Accordingly, the case is remanded for correction of the sentences and correction of the mittimus.

 JUDGE FURMAN concurs.

 JUDGE BERNARD specially concurs.

 JUDGE BERNARD, specially concurring.

 ¶72        I concur with the majority opinion except for its decision in Part III to address defendant’s unpreserved double jeopardy contention. I specially concur with the result that the majority reaches on that issue.

 ¶73        Divisions of this court are split on the answer to the question whether we should address unpreserved double jeopardy issues on direct appeal. Compare, e.g., People v. Greer, 262 P.3d 920, 931 (Colo. App. 2011) (J. Jones, J., specially concurring) (There is not "a categorical rule that an appellate court cannot review unpreserved constitutional contentions for plain error, subject only to a few limited exceptions."), with People v. Tillery, 231 P.3d 36, 52-59 (Colo. App. 2009) (Bernard, J., specially concurring) (questioning whether unpreserved sentencing errors, including allegations of double jeopardy error, are subject to plain error review), aff’d on other grounds sub nom. People v. Simon, 266 P.3d 1099 (Colo. 2011).

 ¶74        I would follow my special concurrence in Tillery in this case. I therefore would not address defendant’s unpreserved double jeopardy claim because I do not think that it is properly before us. See also People v. Cagle, 751 P.2d 614, 619 (Colo. 1988) ("It is axiomatic that this court will not consider constitutional issues raised for the first time on appeal.").

 ¶75        I note that our supreme court has granted petitions for writs of certiorari in several cases to review the issue whether a double jeopardy claim can be raised for the first time on appeal. E.g., People v. Smoots, 2013 COA 152 (cert. granted June 30, 2014); People v. Hill, (Colo. App. No. 12CA0168, Aug. 8. 2013) (not published pursuant to C.A.R. 35(f)) (cert. granted June 30, 2014); People v. Reyna-Abarca, (Colo. App. No. 10CA0637, Aug. 1, 2013) (not published pursuant to C.A.R. 35(f)) (cert. granted June 30, 2014).

 ¶76        My position does not mean that defendant will not have his day in court on this issue. Defendant could, instead, raise it in the trial court in a Crim. P. 35(c) motion. We could then review the trial court’s ruling on that motion in any appeal that defendant or the prosecution might file.

These opinions are not final. They may be modified, changed or withdrawn in accordance with Rules 40 and 49 of the Colorado Appellate Rules. Changes to or modifications of these opinions resulting from any action taken by the Court of Appeals or the Supreme Court are not incorporated here. 

Colorado Court of Appeals Opinions || April 7, 2016

Back